## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| OCCUPY MINNEAPOLIS, an unincorporated organization; BENJAMIN EGERMAN, an individual; BENJAMIN PAINTER, an individual; SAMUEL RICHARDS, an individual; MELISSA ROWAN, an individual; and those similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF HENNEPIN, a legal government entity incorporated under the laws of the State of Minnesota, COMMISSIONER MIKE OPAT, an individual, COMMISSIONER MARK STENGLEIN, an individual, COMMISSIONER GAIL DORFMAN, an individual, COMMISSIONER PETER MCLAUGHLIN, an individual, COMMISSIONER RANDY JOHNSON, an individual, COMMISSIONER JAN CALLISON, an individual, COMMISSIONER JEFF JOHNSON, an individual, HENNEPIN COUNTY ADMINISTRATOR RICHARD P. JOHNSON, an individual, HENNEPIN COUNTY SHERIFF RICHARD W. STANEK, an individual, and certain unknown, unnamed HENNEPIN COUNTY SHERIFF DEPUTIES and SECURITY OFFICERS all in their individual and official capacities as Commissioners or Officials of Hennepin County,<br><br>Defendants. | Court File No.: _____<br><br><br><br><br>**VERIFIED COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

For its Verified Complaint against Defendants, Plaintiffs state and allege as follows:

## INTRODUCTION

1.     This action seeks declaratory and injunctive relief pursuant to 42 U.S.C. §§ 1983 and 1988 for Defendants' violation of the Plaintiffs' rights under the 1st, 5th and 14th Amendments to the United States Constitution.  This action challenges an attempt by Hennepin County to pass a Resolution which is directly aimed at suppressing the political speech of Plaintiff OccupyMPLS, its members and elected representatives, which the County has concluded is messy and inconvenient. This action also challenges Hennepin County's attempt to enforce certain unwritten restrictions intended to suppress Plaintiffs' speech.   Plaintiffs seek to vindicate their constitutional right to protest the enormous economic injustice marring the United States in a quintessentially public forum -- the Hennepin County Government Center Plazas -- that historically the County has allowed to be used for public speech without the kinds of restrictions the County now seeks to impose.  The new restrictions the County seeks to impose upon OccupyMPLS are a direct result of the political speech of OccupyMPLS, which has continuously occupied the Plazas since October 7, 2011 as a means of calling attention to the economic injustices ravaging the country.  The restrictions the County is attempting to impose are designed with the specific purpose of restricting Plaintiffs' political speech.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Relief Act, 42 U.S.C. § 2201 et seq.

3.      Venue is proper in this Court under 29 U.S.C. § 1391(b) as all events took place in Minneapolis, Minnesota, and the parties are located in Minneapolis. Plaintiffs are residents of Minneapolis and the surrounding Greater Minneapolis-St. Paul area.

## PARTIES

4.      Plaintiff Occupy Minneapolis ("OccupyMPLS")[1] is an unincorporated political association that is headquartered in Minneapolis, Minnesota, which was formed by its members for the purposes of organizing for political change, economic justice, and citizen participation in government. OccupyMPLS seeks to bring attention to the imbalance in our financial system and to ensure that politicians are as concerned about and responsive to the citizens of our country without means or with moderate means as they are to those with the most. OccupyMPLS seeks to raise awareness of the issues that it attempts to address by engaging in public demonstrations and marches, by disseminating leaflets and other information to the public, and by engaging other citizens in the process of political dialogue, among other means of constitutionally protected speech. OccupyMPLS was formed in the aftermath of the Occupy Wall Street movement in New York City and is part of a world-wide movement inspired by Occupy Wall Street. There are now similar occupations in over 1,100 cities across the country and the world. OccupyMPLS established its "occupation" on October 7, 2011, at the Hennepin County

---

[1]OccupyMinneapolis was formerly known as OccupyMinnesota or OccupyMN. However, due to the fact that other "Occupy" groups were established in Duluth, Rochester, and St. Paul, the Minneapolis faction is now known as OccupyMinneapolis or OccupyMPLS.

Government Center Plazas ("the Plazas), public plazas located in downtown Minneapolis, Minnesota, and have maintained a presence there ever since.

5.     Plaintiff Benjamin Egerman is an elected delegate of OccupyMPLS.  He has been a resident of Minneapolis and Hennepin County since June 2008.  Prior to that time, he attended Carleton College where he earned a Bachelor of Arts degree in History.  He rents his home and is a Hennepin County taxpayer.  Plaintiff Egerman has been involved with OccupyMPLS since its inception, attending pre-occupation organizing meetings and participating in events and activities starting on the first day of the occupation of the Hennepin County Government Center Plazas.  He has organized rallies and events, and worked on various OccupyMPLS committees including Public Safety, Media and Livestream internet video channel.  His work with Public Safety includes helping to ensure that people's property is not stolen and helping to keep the peace.  His work with Media and Livestream includes speaking to reporters about the occupation, operating the Livestream cameras and speaking to viewers of the Livestream.  Plaintiff Egerman has often slept on the Plazas and he wishes to continue doing so in order to help maintain a continuous presence, which is one of the hallmarks of the Occupy movement.

6.     Plaintiff Benjamin Painter is an elected delegate of OccupyMPLS.  He was born in Hennepin County and has been a resident of the county for most of his life, most recently living in Plymouth, Minnesota in an apartment he shares with his brother.  He attended college at St. Scholastica but was forced to put his studies on hold in order to pay off his student debt and earn money to pay for his education.  He currently works as an AmeriCorps tutor at a public elementary school.  He also provides private math

tutoring to elementary school students.  He was raised by a single mother who had to work in the evenings to provide for her children.  He was the first in his family to attend college and has worked  hard to make a better life for himself but he feels that no matter how hard he pushes forward to improve his life, there is a flood going the other way. Plaintiff Painter has participated in numerous aspects of OccupyMPLS including Kitchen Duty, Sanitation and Security.  He makes every attempt to clean and organize the area and has intervened to mediate and keep the peace when heated arguments have occurred. Plaintiff Painter sleeps on the Plazas almost every night and then wakes up early, and goes home to do laundry and clean up for work.  Because of his work schedule, he is only able to spend time on the Plazas in the evening and nighttime hours.

7.     Plaintiff Samuel Richards is an elected delegate of OccupyMPLS.  He is a lifelong resident of Hennepin County and currently resides in Minneapolis.  Plaintiff Richards attended the University of North Dakota where he joined the North Dakota National Guard.  He anticipates being deployed to Washington, D.C. in 2013.  Plaintiff Richards has been a political activist since high school and joined the Occupy movement because he does not like the direction that the world is going in and wants to do what he can to help create change.  He has participated in numerous aspects of OccupyMPLS including Outreach, Events organizing and Media by speaking on and operating the Livestream.  Plaintiff Richards has made several attempts to convince Hennepin County Commissioners to ease restrictions on OccupyMPLS including speaking at a Hennepin County Board of Commissioners meeting and meeting with the Commissioners' aides.

He has also strived to maintain nearly daily contact with the Hennepin County Sheriff's office and building security.

8.     Plaintiff Melissa Rowan is an elected delegate of OccupyMPLS.  She has been a resident of Minneapolis and Hennepin County for approximately five years.  She works full time as a cashier at a natural foods co-op.  She is a dynamic member of her community with such activities as volunteering as a playground attendant and being an active participant in the peace activism community.  She rents her home and is a Hennepin County taxpayer.  Plaintiff Rowan has been actively involved with OccupyMPLS since day one of the occupation.  For the first 2 1/2 weeks she slept on the Plazas along with other occupiers.  Because of her work schedule, she has limited time to spend on the Plazas during the daytime hours.  Her routine would be to spend the night on the Plazas, return home to prepare for work, go to work and then return to the Plazas after work to again spend the night.  When she was able to be on the Plazas[2] during the daytime hours she would bring her button-maker to help people make buttons with political messages.  She would also bring flyers and magazines to distribute in order to disseminate her political messages.  After becoming sick with a cold, she discontinued sleeping on the Plazas so that she could heal and not aggravate her illness by being exposed to the elements overnight.  She no longer sleeps on the Plazas because the inability to shelter herself from the elements poses health concerns for her.  After

---

[2] Plaintiff Rowan is no longer able to be on the Plazas due to a trespass notice she received for chalking.  *See* Verified Complaint, ¶ 36.

discontinuing sleeping on the Plazas she still participates in daytime activities including rallies, marches, teach-ins and distributing literature.

9.     Defendant County of Hennepin in Minnesota ("Hennepin County") is a legal government entity incorporated under the laws of the State of Minnesota, and capable of suing and being sued.   Defendant Hennepin County is the legal entity responsible for the actions of the Hennepin County Sheriffs' Department.   Hennepin County is being sued in its own right and on the basis of the actions of its officers, employees and agents, in their official capacities, which were taken pursuant to Hennepin County Rules, Policies and Regulations.   At all times relevant herein, the officers, employees and agents of Hennepin County were acting under the color of state law.

10.     Defendants Commissioner Mike Opat, Commissioner Mark Stenglein, Commissioner Gail Dorfman, Commissioner Peter McLaughlin, Commissioner Randy Johnson, Commissioner Jan Callison, and Commissioner Jeff Johnson ("Hennepin County Board of Commissioners") are, and were at all times relevant to the facts alleged herein, the duly elected representatives of Hennepin County, Minnesota and as such are responsible for the actions of the agents, employees and department personnel of Hennepin County which were taken pursuant to the Hennepin County Rules, Policies and Regulations.   The Hennepin County Board of Commissioners is being sued in its own right and on the basis of the actions of the officers, employees and agents acting under their direction and control.   At all times relevant herein, the Hennepin County Board of Commissioners were acting in their official capacities and under color of state law.

11.     Defendant Richard P. Johnson is the County Administrator for Hennepin County in Minnesota.  He is sued in his official and individual capacities.

12.     Defendant Richard W. Stanek is the Sheriff for Hennepin County in Minnesota.  He is being sued in his official and individual capacities.

13.     Defendants unknown, unnamed Hennepin County Sheriff Deputies and Security Officers are employed by Hennepin County, Minnesota.  They are being sued in their official and individual capacities.

14.     At all times relevant to the facts alleged herein, all County officers, employees and agents pursuant to authority delegated or conferred to them by Defendant Hennepin County, and in doing or failing to do the things complained of herein, were acting within the scope of that authority.

## STATEMENT OF FACTS

### I.      Background of the Occupy Movement

15.     On September 17, 2011, a movement now known as "Occupy Wall Street" began in New York City.  The goal of the movement was to protest and end growing wealth disparity in the United States, the disenfranchisement of the poor and middle class, corporate control and influence in politics, and to combat systemic discrimination based upon race, sex, gender, class, nationality, and sexual orientation.  A key message of the Occupy movement is that there is something fundamentally wrong with our current political and economic system.  The Occupy Wall Street movement garnered international attention and similar demonstrations have begun in over 1,100 cities across the United States and the world.

16.     OccupyMPLS is a direct outgrowth of the Occupy Wall Street movement and adheres to the same principles and political message.  The purpose of OccupyMPLS is to voice political concerns, to provide an avenue for political speech, and to encourage political participation and awareness by its members and the general public.

17.     OccupyMPLS is committed to peaceful and responsible political demonstrations.  OccupyMPLS does not condone or tolerate any form of violence, discrimination, waste, or public nuisance.

18.     OccupyMPLS is governed by a General Assembly which is driven by consensus decision-making.  There is no single representative with decision-making authority, and all decisions are made pursuant to established procedures.

19.     OccupyMPLS communicates with its members and the general public through its website, http://www.occupymn.org.  OccupyMPLS also maintains a Facebook page with over 10,000 fans at http://www.facebook.com/OccupyMN and a live video stream located at http://www.livestream.com/occupymn.

20.     The groups within the "Occupy" movement, including OccupyMPLS, give voice to their speech by maintaining a 24-hour presence on a specific public property and by engaging in protected speech and assembly during that time.  This style of demonstration and assembly has garnered international attention and spurred political discourse throughout the country.

21.     The continuous around-the-clock, seven-days-per-week physical presence in public space at the Hennepin County Government Plazas (the "Plazas") is a unique and critical part of the method and message of Plaintiffs and the OccupyMPLS movement.

Without such demonstrations, individuals associated with the movement will be deprived of the most effective means of assembling and communicating their political message. Plaintiffs also believe this presence is required to draw attention to the problems concerning the economic and political systems' failure to adequately address the needs and interests of "the 99%" who do not control the majority of wealth.  Plaintiffs believe that there is strength in the physical uniting and coming together of all of "the 99%" of persons who do not control the majority of the wealth and seek to connect to and associate with other "Occupy" participants around the country and around the globe.  Just as the Civil Rights Movement in this country began with sit-ins at all-white lunch counters and took years to achieve its objectives, Plaintiffs intend to maintain the 24-7 presence in the public space of the Hennepin County Government Center Plazas until the change they seek is achieved.

22.     Being able to sleep on the Plazas is an important element of OccupyMPLS' message because it draws attention to the foreclosure crisis and the attendant homelessness crisis racking the nation.  A 24/7 protest presence is a critical reminder that the foreclosure crisis and homelessness are problems affecting millions of Americans, every hour of every day.  The 24-7 occupation of the Plazas even as the Minnesota weather turns bitter cold demonstrates the determination of the people involved. Maintaining a constant presence is not an easy thing to do and doing so sends a message about the importance of the inequities that OccupyMPLS is attempting to draw attention to.  People who are homeless or who have been marginalized by our economic inequities are sleeping outside out of desperation and because they have nowhere else to go.  By

sleeping outside in makeshift tents and other shelters, OccupyMPLS is demonstrating what homelessness looks like.  In addition, the tents symbolize a sense of the community that they are creating.  This occupation is not about camping or sleeping outside in the winter.  It is about demonstrating the desperation that some people in our society have been driven to.  It calls attention to people who are needlessly suffering.

23.     Furthermore, one of the goals of the OccupyMPLS movement is to give voice to the silent supermajority of people in this country who have no access to the major media outlets and who are outside of and unconnected to our political system.  Occupying the Plazas allows Plaintiffs to be together with one another and to talk about how they can change the system.

24.     The continuous presence at the Plazas also helps OccupyMPLS maintain its momentum.  Plaintiffs recognize that the image of young people sleeping outside, in the cold, in the Plazas can be visibly disturbing to people coming to work in the morning.  Plaintiffs believe that people *should* be bothered when they see such a sight because there are things that are happening in our economy that are seriously wrong - people are losing their homes and have nowhere else to go.  The sleeping in the Plazas is thus an effective way to draw attention to OccupyMPLS' fundamental message of economic injustice.

25.     Plaintiffs also believe it is critical to connect with other "Occupy" participants here and around the country through "live-streaming" their activities on the Internet and engaging in running commentaries and "live chats" on the Internet.  Plaintiffs consider the computerized, Internet-based live-streaming conveyance of the demonstration to be as important, or more important, than the conveyance of their

message to Minneapolis' pedestrians or motorists via the holding of signs.  Being able to broadcast the OccupyMPLS demonstrations via Livestream is an essential element of the occupation because it allows the OccupyMPLS movement to connect to people who are unable to physically be at the Plazas because of their work schedules or because of their remote location or lack of transportation.  This occupation is more than a single event or protest - it is a social movement and it is happening all the time.  The Livestream helps Plaintiffs to convey their ongoing movement and messages to the world.  OccupyMPLS participates in a Livestream channel entitled Global Revolution.  Their participation allows them to be a part of a broader activist community and allows them to connect with, and share information and resources with other Occupy groups and other social movements around the world.  The provision of electricity by Hennepin County on the Plazas is instrumental in ensuring that Plaintiffs can livestream their demonstrations and amplify the scope of OccupyMPLS' audience.  Plaintiffs believe that, given the lack of mainstream media coverage for political demonstrations, providing an unedited, unfiltered livestream of OccupyMPLS' activities serves a critical need to be the eyes and ears of their movement for the benefit of people who are unable to attend in person.

26.     OccupyMPLS' ability to post and affix signs on the Hennepin County Government Center Plazas public property is also an important tool for effectuating and increasing the impact of the group's message.  Trains go by the North Plaza every 20 minutes.  People on the trains see people on the Plazas as well as the signs and that lets them know that there is a political demonstration going on.  Without signs, especially at times when there are just a few people demonstrating on the Plazas, people passing by

will not be alerted to the fact that there is an ongoing political demonstration happening on the Plazas.  In addition, being able to affix signs is important to Plaintiffs because it shows that their political movement is connected to a particular space:  the Hennepin County Government Center Plazas.  Furthermore, the ability to affix political signs to benches, posts, and other County property on the Plazas with twine or tape (so as not to leave an impact or marks on the property) is an important tool to ensure that the protesters can communicate their message even in Minnesota's challenging winter weather conditions, such as when the wind or snow blowing would make holding and/or marching with a physical sign difficult or even impossible.  When signs are not affixed, they are at risk of being strewn around the Plazas by the wind and not being visible to spectators.  Here are several examples of OccupyMPLS' signs, affixed to the Plazas with plastic, tape or in other ways so as not to damage the property.[3]

---

[3]The OccupyMN "People Before Profits" photo can be found at: http://www.flickr.com/photos/70267096@N00/6245757794/sizes/l/in/photostream/.







27.     OccupyMPLS also uses chalk drawings and chalk writings to express its critical messages to those walking on or by the Plazas.  Chalk drawings and writings by nature are temporary and have no permanent damaging effect on the Plazas in that rain, snow and time can wipe them out.  Despite their ephemeral nature, OccupyMPLS finds chalk drawings to be an important element of their communication of their message to the public.  Here are several examples of OccupyMPLS' use of chalk to express the movement's critical messages.







II.     **Occupy Minneapolis in Government Center Plazas**

28.     The Hennepin County Government Center in Minneapolis is the prime venue for Minnesota's largest judicial district and the primary county government administration building for Hennepin County.  It has 24 stories and is enclosed by glass windows to form an atrium.  A sign in the atrium states "Dedicated May 24, 1977 to the people it services in this century and the next."  The Government Center is built over 6th Street using air rights over the Street, which enabled two large plazas ("Plazas") to be built in the city blocks on both sides of the Government Center .

29.     Based upon their proximity to both Minneapolis City Hall and the Hennepin County Government Center, the public has repeatedly used the Plazas for political, social and labor demonstrations.  *See* for example http://www. facebook.com/group.php?gid=92045398838&v=wall (noting the details for a June 2009 demonstration on the Plazas for a free Iran) and http://batchgeo.com/map/ eaae325f75419fed9793ac9fe6de566d (identifying the Plazas as the location for a March 2011 workers' rights rally organized by political organization Moveon.org).

30.     A Minneapolis Ordinance, City Code § 244.60, prohibits tents or other temporary structures to be placed upon any public or private premises or street in the city that is used as a shelter or enclosure of persons and their effects, for the purpose of living therein.  Section 244.60 reads as follows:

> Temporary housing prohibited; exception.  No camp car, house trailer, automobile, tent or other temporary structure may be parked or placed upon any public street or on any public or private premises or street in the city and used as a shelter or enclosure of persons and their effects for the purpose of living therein.  However, in a temporary situation a special

council permit may be obtained to allow such housing for a specific period of time.

31.     Effective April 2011, Hennepin County adopted a policy expressly governing the public's use of the Hennepin County Government Center and the Plazas.  It is entitled "Use of Space by the Public in County Facilities" (the "Policy").  A copy of the April 2011 Policy is attached as Exhibit A to Plaintiffs' Verified Complaint.  The purpose of the Policy "is to promote availability of public space" and "to facilitate maximum usage of this space" in accordance with the law.  (Verified Complaint, Exhibit A, at 1.)  The term "public space" is defined to include the "Public Service Level (skyway level)," "Outdoor plazas," "lobbies," and other rooms in the Government Center.  (*Id.*)

32.     The Policy states **"[a]ccess to buildings is allowed to the extent permitted by federal and state law**."  (*Id.* at 2 (emphasis in original).)  The Policy expressly contemplates the public's use of "tables, chairs, after-hours access," usage "[d]uring closed hours" and other services when special arrangements are made.  (*Id.*)  The Policy states "[o]rganizations may be required to pay for expenses incurred by the county for utilities" and "other costs associated with building use in accordance with fees established by the county."  (*Id.* at 3.)[4]

33.     On October 7, 2011, individuals associated with OccupyMPLS began demonstrations on the Plazas.  The demonstrations began with only a few individuals and

---

[4]The Policy requires all outside organizations to indemnify and hold the county harmless from any liability resulting from use of space, obtain insurance, and comply with other laws and policies.  (Complaint, Exhibit A, at 3.)  The county has not sought to impose the insurance and indemnification obligations on the Plaintiffs.

quickly grew.  The demonstrations were focused on voicing political concerns, advancing the political causes of the Occupy movement and, at all times, focused on providing an avenue for the free expression of political ideas and a common point of assembly for interested citizens.  The Plazas were renamed by OccupyMPLS as the "People's Plaza" early on in the movement's activities.

34.     After October 7, 2011, each night, a number of individuals have remained in the Plazas overnight to maintain the demonstrations.  Those who remain in the Plazas maintain a quiet presence and do not disrupt any nearby road, thoroughfare, business, apartment, or public facility.  By remaining on the Plazas, demonstration activities can continue throughout the night and individuals assemble to participate in the free expression of ideas.  County Sheriffs and security personnel have monitored the Plaintiffs' and OccupyMPLS' demonstration to maintain security and ensure the safety of all participants and the public.  Since October 7, 2011, Plaintiffs and other demonstrators' physical presence on the Plazas has grown and ebbed.  Plaintiffs have attempted to position themselves and their property so as not to obstruct other pedestrians' usage of or passage through the Plazas.

35.     On or about October 14, 2011,[5] OccupyMPLS demonstrators were told by Hennepin County that they were prohibited from the following:  (1) putting up tents, tarps or other structures; (2) sleeping under the building on 6th Street; and (3) affixing

---

[5]Information about the new restrictions on the OccupyMPLS' demonstrations was made available in a press release on the County's website, and can be found at: http://hennepin.us/portal/site/HennepinUS/menuitem.b1ab75471750e40fa01dfb47ccf064 98/?vgnextoid=0df795312aad2310VgnVCM20000098fe4689RCRD.

signs to county buildings. They have also been told that chalking on the Plazas is prohibited since it allegedly constitutes criminal damage to property.

36.     The Hennepin County Sherriff's Office has issued numerous trespass notices to demonstrators on the Plazas for engaging in such activities as being in possession of street chalk, or chalking political messages on the Plazas.  For example, on one occasion, Plaintiff Rowan drew some butterflies on the Plazas ground near the fountain area.  She was approached by two Hennepin County security officers who informed her that chalk was banned because some people had chalked on benches and it interfered with the ability to sit on the benches.  She said that she was chalking on the ground and not on a bench; however, they persisted in telling her that chalking was not allowed.   Before leaving for the day, she wrote the word "occupymn.org" on a short wall that abuts the sidewalk on 3rd Avenue.  As she left the property, two Hennepin County deputies issued her  a trespass notice ordering her not to return to the property for 90 days. The trespass notice has interfered substantially with her ability to take part in OccupyMPLS' activities.  Plaintiff Rowan serves on the Events Committee and helps to plan events; however, she cannot participate in those events that take place on the Plazas. She must watch activities from the sidelines by remaining on the public sidewalk.  She is unable to interact with fellow OccupyMPLS participants because she cannot go onto the Plazas to speak with them.  She has attended some of the evening OccupyMPLS General Assembly meetings; however, she is unsure whether or not the skyway connecting the Hennepin County Government Center Building to the parking ramp is included in the

trespass notice and many of the General Assembly meetings are held there.  She believes that the 90-day restriction is out of proportion to her conduct.

37.   Demonstrators have also been prohibited by the Sherriff's Department from affixing political signs to the Plazas, either through tape or use of twine.  Plaintiff Egerman was on the Plazas when Hennepin County officials began removing signs that had been affixed at various locations on the Plazas prior to the adoption of the November 8, 2011, Resolution.  One individual refused to move from in front of a sign and was threatened with arrest.  Plaintiff Egerman and others linked arms with the individual and deputies relented and ultimately allowed the signs to remain in place. Plaintiff Egerman also helped to hang a large colorful flag-like sign that read, "We Are the 99%" on the Plazas.  The sign was removed by Hennepin County officials.

38.   At one point during the occupation, Plaintiff Richards learned that Hennepin County officials had ordered them to stop placing signs on the Plazas with blue painter's tape, a tape that had specifically been used by Plaintiffs in order to avoid leaving any marks on Hennepin County property.  Plaintiff Richards then attempted to hang a small banner between two light poles using twine.  Hennepin County officials ordered him to remove the banner.  He stated that it was his understanding that the objection was to the use of tape and that twine did not pose the same risk.  The official told him that a banner tied between two light poles could cause too much tension on the poles; however, the banner was light and was tied loosely so that it would not cause tension.  Plaintiff Richards complied with the order and removed the banner.

39.     At one point the Hennepin County Sherriff's Department erected an open-air canvass on the south side of the Plazas.   When demonstrators adorned the canvass with political signs, they were ordered to take the signs down.

40.     On November 12, 2011, the Hennepin County Sheriff's Department ordered the immediate removal of a tent-like political sign belonging to a member of OccupyMPLS from the Plazas, even though the sign was not affixed to anything and none of the demonstrators was using the sign for purposes of shelter, living or storing personal possessions.  Although the sign was in the shape of a tent; the opening was only two feet wide and was not usable as a shelter.   The sandwich-board style sign had been placed on the Plazas in an attempt to still have visible signs that also complied with Hennepin County's order to not affix signs to the Plazas.  Plaintiff Painter was present when fellow occupiers made and displayed the tent-like sign.   Hennepin County deputies told the group that the sign was not allowed and ordered them to remove it.   Plaintiff Painter told deputies that it was a sign, not a tent and that it belonged to OccupyMPLS and asked that it be allowed to remain.   Deputies seized and destroyed the sign before carrying the pieces off of the property.   Plaintiff Richards was present when Hennepin County deputies dismantled and removed the sign.   Plaintiff Richards operated the livestream video that documented the actions of deputies in picking up, dismantling and carrying off the sign.  Below is a photo of the tent-like sign seconds before its removal by Hennepin County deputies:



Below is a photo of the removal of the sign by Hennepin County deputies:



A full video of the removal of the sign can be found here:  http://youtu.be/n7Djc7JFy8M.

41.     Plaintiff Richards was also present when a Hennepin County deputy removed a sign that read, "Stanek is scared."

42.     In order to maintain their health and well-being, the demonstrators engaged in around-the-clock demonstrations have brought coolers of food and drinks and medical supplies, as well as literature, to the Plazas.  In order to support the demonstrators who remained on the Plazas overnight, some have brought tents, collapsible tents, and sleeping bags.  Long-term demonstration is not realistically possible without individual demonstrators having at least some modicum of personal possession, food, and shelter with which to support themselves.  Further it is not practical or reasonable for Plaintiffs to demonstrate throughout the day without straying more than a few feet from some of their personal possessions.  Restroom breaks, listening to and giving speeches and participating in general assemblies and other activities of the OccupyMPLS demonstrators do involve, on occasion, moving more than a few feet away from personal property.

43.     Despite this necessity, Defendants have told Plaintiffs they are not permitted to build tents and/or temporary shelters on the Plazas, and have torn down those structures built by Plaintiffs during their occupation of the Plazas.  Furthermore, Defendants have told Plaintiffs that they are not permitted to leave their personal items unattended on the Plazas.  Indeed, County officials have expressly warned Plaintiffs that their personal items will be confiscated and have moved a dumpster nearby for the apparent purpose of disposing of "unattended" items.

44.     When Hennepin County initially told OccupyMPLS that they could not have tents because of Hennepin County's concern for public safety regarding activities that may go on inside the tents and outside of the view of the authorities, Plaintiff Egerman helped to design and build clear plastic shelters that were intended to address the County's public safety concern, but also ensure Plaintiffs' health and safety concerns by protecting them from the elements and providing them with some warmth and shelter during their 24/7 demonstrations.  Plaintiff Egerman spent his own money to purchase supplies for the clear plastic shelters.

45.     Plaintiff Egerman was sleeping in one of the clear plastic shelters along with several other occupiers when tens of  Hennepin County deputies awoke them in the middle of the night, informed them that the clear shelters were a violation of Hennepin County policies, and ordered them out of the shelters.  Occupiers including Plaintiff Egerman linked arms around the shelters until deputies forcibly moved the demonstrators out of the way and seized and destroyed all of the clear plastic shelters.  After initially being told that he could retrieve his property (the materials used to make the shelters), Plaintiff Egerman was later told that the materials would not be returned until after their "event" (meaning the occupation of the Plazas) was over.

46.     Plaintiffs Egerman and Rowan were part of a group of protesters who became frustrated with the lack of shelter from the elements on the Plazas.  They and a group of individuals brought tents to an adjacent area of the U.S. Bank Plaza in order to call attention to Hennepin County's refusal to allow them to shelter themselves and also in order to call attention to the foreclosure crisis.  Their intent was to make a symbolic

link between Hennepin County's confiscation of shelters on the Plazas with the fact that every day, people who are being kicked out of their homes due to the foreclosure crisis. To Plaintiff Egerman, tents are not intended for "camping".  They are a symbol of the need for shelter and the needs of tens of thousands of people who are unable to stay in their homes because of current economic conditions.  They were arrested by Minneapolis police and charged with misdemeanors for obstructing traffic.  Charges are pending and their next hearings are scheduled for January 9, 2012.

47.    Further, on the evening of November 19, 2011, during the night of the first snowfall in Minneapolis four members of OccupyMPLS who were sleeping at the Plazas to draw attention to the plight of the homeless were issued trespass notices, including one person for smoking in an area that had previously been allowed for smoking.

48.    Access to electricity is also an important tool to help protect the health and safety of the demonstrators while on the Plazas.  After being unable to stay overnight on the Plazas because of her health concerns, Plaintiff Rowan brought tea, cocoa and cough drops to the Plazas in order to help others stay warm and healthy as they maintained their continuous presence there.  However, since Hennepin County had shut off electricity to the area, Plaintiff Rowan has been unable to heat water for the tea and cocoa without access to electricity.  With regard to the health and safety of individuals using the Plazas, Ann Bancroft, a native of Scandia, Minnesota, and the first woman in history to travel over the ice cap to the North and South Poles was consulted and provided training. Plaintiffs have offered to sign a waiver relieving the County of any supposed liability.

### III.    Hennepin County Policies Regarding the Use of the Plazas by the Public

49.    Despite the City of Minneapolis' ordinance prohibiting the construction of tents and temporary structures, Hennepin County has allowed tents to be erected and signs affixed to the Plazas in the past without objection, admonition or confiscation.  The inconsistency of the County with respect to signage and tents on  the Plazas belies the claim that the restrictions the County is attempting to impose upon OccupyMPLS pursuant to the Procedures  discussed below are content-neutral.  Instead, the County's own historical practices confirm that the purpose of the Resolution is to suppress the political speech of OccupyMPLS and its members that the County has determined is inconvenient, messy and unaesthetic.  Democracy is supposed to be messy.  It is a fundamental principle of our country that government should not be allowed to pick and choose which speech it will allow and which it will not.

50.    For example, in the past, Hennepin County has permitted the use of tents on the Hennepin County Government Center Plaza during demonstrations, rallies, events, and cultural presentations.  On June 10, 2011, Bike/Walk to Work Day was celebrated at the Plazas with a fair featuring sixteen alternative transportation-oriented organizations, each hosted at tables and tents at the event.  *See* http://www. tcdailyplanet.net/ news/2011/06/10/bike-walk-week-celebrations-continue.  Here are photos of some of the tents and temporary shelters on Hennepin County Government Center Plazas on the Bike/Walk to Work Day in 2008.[6]

---

[6]These photos can be found at: http://www.flickr.com/photos/dee_pix/ 2493267865/and http://www.flickr.com/photos/dee_pix/2493267989/.





51.     Although Hennepin County has shut off the electricity available on the Plazas during OccupyMPLS' demonstrations, Hennepin County offers electricity in electrical outlets on the Plazas as a benefit to the public in using the space.  The electrical outlets are used, for example, by cultural arts performers during the Hennepin County Government Center "Summer on the Plaza" events.  *See*, for example the below photos from Summer on the Plaza 2009 and 2011.[7]



_____

[7]These       photos       can       be       found       at
http://www.flickr.com/photos/hennepincountymn/5852760553/in/photostream       and
http://hennepin.us/portal/site/HennepinUS/menuitem.b1ab75471750e40fa01dfb47ccf064
98/?vgnextoid=aee626129cac4210VgnVCM10000049114689RCRD.



52.     Furthermore, the County has not been even-handed in ordering the removal of signs affixed to the Hennepin County Government Center or the Plazas now or in the past.   For example, on the 7th floor of the Hennepin County Government Center Administrative Tower, there is a poster attached by tape to the window that overlooks the inner courtyard area.  The poster faces outward.  It is an American flag with an eagle on it, and the words "Proud to be an American."  Here is a photograph of that poster, as affixed to the Hennepin County Government Center.



On information and belief, the Hennepin County Sherriff's Office has never required that this sign be removed.  The County also allows signs to be affixed to the Plazas if they belong to the county.

53.     In addition, when Hennepin County endorses the message displayed upon signs, it has encouraged and permitted participants in events on the Plazas to physically affix signs to the Plazas.  For example, the Plazas were the site of a coexistence art exhibit initiated and created by the Museum or the Seam, Jerusalem, Israel from May 1 – June 12, 2004 sponsored by two Minnesota corporations and the University of

Minnesota.[8]   As the photos here show, Hennepin County did not object to the exhibitors erecting multiple large signs and banners affixed to the Plazas and left overnight for a six-week period.   The signage erected by the exhibitors had nothing to do with the business of Hennepin County and it included political messages that, on information and belief, the County apparently endorsed.   Here are photos of the six-week exhibition on the Plazas.[9]







54.   Hennepin County has also permitted chalk drawings on Hennepin County property in the past without objection or censorship.  On August 4, 2011, individuals and families drew hundreds of images in chalk outside of the Plymouth Library in Plymouth, Minnesota, property of which Hennepin County is the sole owner.[10]   Here are some photographs of the chalk drawings from that event.[11]



---

[10]The ownership information for the Plymouth Library is contained in the Hennepin County tax assessor's records, and information for that property in those records is attached as Exhibit B to the Verified Complaint.

[11]Photographs from the "Once Upon A Time" event at Plymouth Library on August 4, 2011 can be found here - http://www.flickr.com/photos/plymouthlibrary/ sets/72157627432787298/with/6055965769/.



On information and belief, the Hennepin County Sherriff's Office did not trespass the individuals and families who engaged in expressing themselves on Hennepin County property at that time, since both the messages and the communicators of those messages were endorsed by Hennepin County.

## IV.    Hennepin County Resolution

55.    Hennepin County is governed by a seven-member Board of Commissioners, each of whom is elected.  In January 1993, the Hennepin County Board of Commissioners passed Resolution No 93-2-50R2 entitled "Rules and Procedures of the Hennepin County Board of Commissioners" ("Procedures").  A true and correct copy of the procedures is attached as Exhibit C to this Verified Complaint.  The stated purpose of the Procedures is to facilitate the transaction of business before the Board.  The

Procedures include numerous Guiding Principles, including that "All meetings of the county board must be characterized by fairness and good faith" and "To the fullest extent possible, members of the public shall have the right to be informed of the Board's process and decisions and the opportunity to present their views to the Board."

56.     The Procedures place limitations on the ability of the Board to immediately approve resolutions brought before the Board.  Section IV(C) of the Procedures provides in pertinent part:

> C.     Resolutions:    Committee;    Immediate Approval.    All resolutions introduced at the County Board level shall be automatically referred to the next meeting of the appropriate standing committee.  If an item must be brought for immediate approval, it will be referred to committee if more than one Commissioner objects to immediate action being taken at that time.  *Items brought in for "Immediate Approval" must meet one or more of the following guidelines:*
>
> > *1.     Be a commendation resolution; or*
> >
> > *2.     Be recommended for immediate approval by the County Administrator; or*
> >
> > *3.     Be non-controversial in nature (no commissioner objects); or*
> >
> > *4.     Be a matter of an urgent nature, or some consequence or crisis will result due to inaction before the next meeting of the Board.  Before a matter may be deemed one of urgent nature under this paragraph, 5/7 vote of the members is required.*

(emphasis added).

57.     On November 2, 2011, Hennepin County announced new Winterization guidelines with respect to the Plazas, and new restrictions on the OccupyMPLS demonstrators.[12] The full text of the Guidelines were as follows:

On Friday, November 4, 2011, Hennepin County will winterize the irrigation system at the Government Center, which involves shutting down the water outside and blowing out the lines that supply water to the sprinkler heads.

**Winterization**

*What will happen?*

Water will be expelled from the sprinkler heads one zone at a time followed by a misting as the residual water is expelled from the system.   The following areas will be affected:

- North Plaza planters - both on the plaza and adjacent to the building

- North Plaza grassy areas

- South Plaza - grassy area in the center and plantings along the perimeter

Note:  Hennepin County staff will work with individuals from Occupy MN to make sure items in the affected areas are moved before this work is performed.  This work will begin on Friday, November 4 at 7:00 a.m. and, therefore, possessions must be moved in advance.  Unattended items will be removed and stored.

*How long will this work take?*

This work will take most of the day (7:00 a.m. - 3:30 p.m.).

*Will there be water available outside once this is done?*

No outside water access will be available once the system is winterized.

---

[12]The full text of the Winterization Guidelines is attached as Exhibit D to the Verified Complaint and is also available at http://hennepin.us/portal/site/HennepinUS/menuitem.b1ab75471750e40fa01dfb47ccf064 98/?vgnextoid=0df795312aad2310VgnVCM20000098fe4689RCRD.

Additional outside maintenance, including sanding of pavers, will also be scheduled during the next few weeks. Occupy MN will be notified in advance.

**Consolidation**

After the winterization of the Government Center on November 4, 2011, Hennepin County will work with Occupy MN to consolidate the location of their possessions. The occupation of the North Plaza has gone on for about 25 days. During this time Occupy MN has been allowed to use the entire North Plaza and leave items unattended on the plaza. As part of the winterization, Occupy MN will need to consolidate their possessions and reduce the size of their occupation on the North Plaza to a designated area on the east or west side of the North Plaza (Hennepin County staff will work with Occupy MN to select the site for this storage). Individuals will continue to have access to the entire North Plaza; however, the possessions will need to be kept in a designated area. In addition, at least one individual must be present in this designated area so that items are never left unattended. Unattended items will be removed and stored.

In addition, during the day (7:00 a.m. to 4:30 p.m.) there can be no unattended possessions on the grounds. Specifically, all sleeping materials used must be picked up and stored under the tarp on the South Plaza or in the designated area on the North Plaza. The number of portable toilets will be reduced to three.

Also, beginning this Friday, any and all signs or posters not placed by county personnel will be removed. No further taping or otherwise adhering of signs to the property will be permitted.

**Future**

Finally, as the temperatures fall and/or it begins to snow, it will become necessary that Occupy MN make further modifications to their occupation of the Government Center plaza in order to ensure personal safety and allow for snow shoveling, snow plowing, snow removal and snow storage. Once the first significant snowfall or severe temperatures are predicted and the temperature falls below twenty-five degrees, no sleeping will be allowed on the Government Center plazas between 10:00 p.m. and 6:00 a.m. At that time, all portable toilets will need to be removed and the canopy will come down.

58.     When Hennepin County issued its "Winterization" memo, Plaintiff Richards spoke with an individual who identified himself as the County Administrator. Plaintiff Richards asked him whether or not the new rules would be adopted by the Board through a democratic process.  The County Administrator responded that, he would be enforcing the new rules regardless of whether or not the Board of Commissioners approved the new rules.

59.     On November 8, 2011, the Hennepin County Board adopted Resolution 11-0490R1 (the "Resolution").   Draft Resolution 11-0490R1, along with the meeting minutes from the November 8, 2011 Hennepin County Commissioner's Meeting are attached as Exhibit E to the Verified Complaint.  The fact that the Resolution would be considered at the November 8 meeting was not included in the Board's preliminary agenda.  The Resolution was not added to the Board's agenda until the final agenda was prepared and posted to the County website on November 7.  Only a vague reference to the Resolution was included in the final agenda under items for "Immediate Approval." The Board does not typically allow public testimony at its meetings and it provided no notice that it intended to allow public testimony on the Resolution during the November 8 meeting.  Upon information and belief, the final Resolution 11-0490R1 is not publicly available.

60.     The Resolution was considered and immediately approved by the Board on November 8, notwithstanding the fact that, upon information and belief, the Resolution was not:  1) a commendation resolution; 2) recommended for immediate approval by the County Administrator; 3) non-controversial in nature; and 4) subject to a vote by the

Commissioners qualifying the Resolution as a matter of urgent nature.   Numerous demonstrators sought to comment on the proposed resolution but were denied the opportunity to speak, although several demonstrators were allowed to address the Commissioners.   Several speakers stated that they were not prepared to testify and would have prepared remarks if notice had been provided that public testimony was going to be heard on the Resolution.

61.    The Resolution adopted the "Procedures for Public Use of the Hennepin County Government Center," dated November 8, 2011 (the "Procedures"), and granted authority to the County Administrator to administer and enforce the procedures.   (*Id.* at 2.)  The Resolution states in relevant part:

> WHEREAS, Hennepin County has adopted a policy entitled "Use of Space in County Facilities ("Policy"), which is designed to promote and control the use of public space in and on Hennepin County facilities;
>
> WHEREAS, starting on October 7, 2011, a number of individuals began to "occupy" portions of the North and South Plazas, located at the Hennepin County Government Center ("Plazas") including sleeping overnight, serving meals, and bringing and storing personal items;
>
> WHEREAS, this "occupation" of the Plazas has continued uninterrupted since October 7, 2011;
>
> WHEREAS, since the building was erected in 1973, Hennepin County has never allowed and there has never been a long-term "occupation" of the Plazas by a group of individuals;
>
> WHEREAS, this is a new and unexpected use of the Plazas;
>
> WHEREAS, the Plazas were not designed for camping or long-term "occupation;"
>
> WHEREAS, the Minneapolis City Code Section 244.60 prohibits tents or other temporary structures to be on any public or private premises in the

city and used as a shelter or enclosure of persons and their effects for the purpose of living therein;

WHEREAS, to date, the "occupation" has in general been peaceful and non-confrontational and Hennepin County staff have communicated with the "occupiers" related to limitations regarding use of the plazas;

WHEREAS, to date, Hennepin County has allowed individuals to "occupy" the Plazas and has accommodated a number of requests by individuals participating in the "occupation," including, allowing individuals to sleep on the plazas, allowing the storage of items on the Plazas, providing access to electric outlets, providing water, allowing portable toilets, and allowing signs and posters to be affixed to the planters and other structures on the Plaza;

WHEREAS, during the past month, a significant number of personal items have been brought to the Plazas and have been continuously stored on the Plazas, and a number of individuals (generally, 35-40 per evening) have slept overnight on the Plazas;

WHEREAS, since the "occupation" began the County Administrator has enforced specific rules related to this non-permitted use of the Plazas by the individuals occupying the plazas;

WHEREAS, there are unique concerns presented by any ongoing occupation of the Plazas, including:

•      health and safety concerns of individuals using the Plazas to sleep;

•      costs of increased security;

•      creation of an ongoing de facto camp ground on the Plazas for any and all to use;

•      inability of other groups and individuals to use the Plazas now and in the future;

•      maintenance of the Plazas, including ongoing winterizing activities;

•      ability to clear snow from the Plazas in a safe, effective and efficient manner;

•      liability concerns related to personal safety and property of individuals; and

- aesthetics of the Plazas.

(*Id.* at 1-2.)

62.   The Procedures, as amended during adoption of the Resolution, state:

**Procedures for Public Use of the Hennepin County Government Center:**

Pursuant to Hennepin County's policy regarding "Use Of Space By The Public In County Facilities" ("Policy"), the Hennepin County Government Center North and South Plazas (hereinafter, "Plazas") are defined as public space and are open for individuals to use, gather and demonstrate at any time. The right to demonstrate or assemble in these locations is governed by this Policy, other applicable state and federal laws and regulations, applicable local ordinances, court orders, and Hennepin County Board resolutions.

In accord with the Policy, the following procedures apply to any and all uses of the Plazas, starting on Monday, November 14, 2011:

- Individuals who desire to demonstrate, assemble or otherwise use the Plazas may do so at any time.

- No signs or posters, except those placed by county personnel related to county business, may be taped or otherwise affixed to the property (including, but not limited to, the Government Center, the planters, and other structures on the Plazas).

- No personal items or possessions (including, but not limited to, tables, chairs, boxes, tarps, and other items) may be stored on the Plazas.

- Personal items and possessions cannot be left unattended on the Plazas or grounds of the Government Center.

- Unattended personal items and possessions will be removed.

- No individuals may sleep on the Plazas or on the grounds of the Government Center.

- No portable toilets are allowed without express written authorization from the County Administrator, who will only allow portable toilets if they are necessary for a limited time due to an expected large crowd for a particular rally, demonstration or event, or a maximum

of one toilet because of an ongoing presence on the plaza after regular business hours.

(*Id.* at 3.)

63. Hennepin County has, for the most part, delayed enforcement of the Resolution except that (i) Hennepin County has regularly enforced the restriction of signs or posters being affixed to the Plazas through tape and twine neither of which pose any risk of harm to County property; (ii) Hennepin County has issued trespass notices to OccupyMPLS members, including Plaintiff, Rowan, who have chalked messages relating to the OccupyMPLS movement.

64. Electricity supply on the Plazas was cut off by the County on Tuesday, November 8, 2011, notwithstanding the fact that Plaintiffs are willing and able to pay for any and all electricity used by them for purposes of demonstrations. The County has rejected Plaintiffs' offer to pay for the electricity because it is not interested in making the Plaintiffs "comfortable." Since OccupyMPLS has been unable to access electricity on the Plazas, it has become more and more difficult to keep laptops, cell phones, and other computer equipment charged so that OccupyMPLS can continue broadcasting the demonstrations online on the livestream. There have been several occasions in which the livestream has stopped broadcasting because the demonstrators' computer batteries have gone dead. Plaintiff Richards has struggled to keep the OccupyMPLS laptop computers charged so that Plaintiffs are able to provide continuous livestream coverage. Since Hennepin County has shut off electricity on the Plazas, OccupyMPLS has resorted to using solar panels to provide power for their computers. However, as the days get shorter

and the angle of the sun changes, the solar panels have less and less utility and OccupyMPLS has had significant difficulties keeping their equipment powered. The lack of power for computers used for livestreaming and for cell phones used for Twitter and Facebook updates to the movement effectively incapacitates the media team's ability to disseminate their message to the broader public.

65.     On at least one occasion, Plaintiff Richards was forced to leave the occupation because of a need to use restroom facilities. For a period of two days, there were no porta-potties because the individual who arranged for the porta-potties grew concerned that, with the implementation of the new rules, the porta-potties would be subject to seizure by Hennepin County officials and he would lose the security deposit that he paid for them. Not wanting to lose the security deposit, that individual called the company and asked them to pick up the porta-potties. The lack of access to restroom facilities made it difficult for Plaintiff Richards and others to maintain their fulltime continuous occupation of the Plazas. On at least one occasion, Plaintiff Egerman has also had to leave the occupation because of the need to use restroom facilities. Plaintiff Rowan has stated that on at least one occasion, after the Government Center facility had closed at 6:00 p.m., she has been forced to leave the demonstration and go home because of the need to use restroom facilities.

## V.     Plans for Future Demonstrations

66.     OccupyMPLS has announced, and communicated to Hennepin County, its intention to continue demonstrations in Hennepin County Government Center Plazas despite the new restrictions.

67.     Because of the desire of Plaintiffs to continue their demonstrations on an around the clock basis, it is critical that they have access to personal items, including chairs to sit on, coats to take on and off, food, and equipment to enable them to communicate their demonstration live around the world.  Pursuant to the Regulations, Plaintiffs will be at risk of having their personal property seized as "unattended" if it is deemed "unattended" no matter what the reason is for Plaintiff's separation from their personal property, or no matter how momentary the actual separation.  Plaintiff Rowan has stated that on one occasion when she and others were sleeping in the 6th Street underpass area, she left her sleeping bag and other items in the area and left the area temporarily.  Hennepin County officials informed several OccupyMPLS members that their belongings would be confiscated if they were left in the area.  Those members collected all of the belongings, including her belongings, and moved them to the other side of the building so that they would not be confiscated.  Prior to the new rules being implemented, the group had a "bag check" where individuals could leave items with an attendant while they went to work.  Plaintiff Rowan often left her sleeping bag, literature and other items with the "bag check" when she left the Plazas to go to work.  When OccupyMPLS was informed of the new rules, they discontinued the "bag check."  Plaintiff Rowan is physically unable to continuously carry her sleeping bag and other gear at all times.  Furthermore, on at least one occasion, Plaintiff Rowan placed on the Plazas a backpack full of her belongings and literature while she was a few feet away conducting a teach-in with other occupiers.  Plaintiff Rowan was warned by another occupier that her bag would be taken if it remained where she had placed it.  She moved

the bag closer to the location where she was conducting the teach-in.  In another instance, the medical team expressed the intention to move much of their First Aid equipment off-site for fear that it too will be confiscated.

68.     The Procedures purport to limit OccupyMPLS to a maximum of one toilet because of an ongoing presence on the Plazas after regular business hours.  The public is not allowed into the Government Center after 6:00 p.m.  Because of the anticipated number of demonstrators who will maintain night-time vigils at the Plazas, it is unreasonable to require that the demonstrators be relegated to using one porta-potty on the Plazas.  Sufficient access to restroom facilities is an important need for individuals to maintain a constant presence on the Plazas.  Plaintiff and OccupyMPLS are willing to continue funding and making arrangements for use of multiple porta-potties to support the demonstrators.

69.     The Procedures also subjects Plaintiffs to the real possibility that their personal possessions will be confiscated by the County if they leave them even momentarily to use restrooms or other facilities inside the Government Center or to purchase hot beverages from one of the adjoining retailers.  While one of the purported concerns listed in the Resolution was liability related to personal safety and property of individuals, it is apparent that by cutting off electricity on the Plazas, by refusing to allow OccupyMPLS protesters to prepare hot meals or liquids on the Plazas, and by threatening to seize property deemed by the County to be "unattended" without specific notification to Plaintiffs of when property will be deemed "unattended," chills Plaintiffs' ability to

create an "occupation" of the Plazas intended to draw attention to the foreclosure and homelessness crisis sweeping the nation.

70.     In addition to the Procedures, Hennepin County has and continues to seek to enforce unwritten restrictions on Plaintiffs, with respect to structures on the Plazas regardless of whether for sleeping or political speech, chalking and electricity.

## CAUSES OF ACTION

### COUNT I

1.  Plaintiffs incorporate all previous allegations as if set forth herein.

2.     Defendants' newly adopted "Procedures for Public Use of the Hennepin County Government Center" and Defendants' unwritten restrictions ("Restrictions") that OccupyMPLS (1) can have no  structures of any kind, regardless of whether they constitute symbolic or expressive speech, or are used for shelter; (2) cannot use electrical outlets located on the Plazas for any purpose; (3) cannot use sidewalk chalk on the Plazas are unconstitutional on their face and as applied under the First, Fifth and Fourteenth Amendment for each of the following reasons:

    a   The Procedures and Restrictions operate as a unconstitutional prior restraint on constitutionally protected expression;

    b   The Procedures and Restrictions abridge the right to freedom of speech and expression protected by the First Amendment;

    c   The Procedures and Restrictions abridge the right to freedom of assembly protected by the First Amendment;

    d   The Procedures and Restrictions  abridge the right to freedom of the press protected by the First Amendment;

e   The Procedures and Restrictions abridge the right to petition the government for redress of grievances protected by the First Amendment;

f   The Procedures and Restrictions confer standardless discretion on County officials to grant or deny permission to demonstrate in and occupy the Hennepin County Government Center plazas;

g   The Procedures and Restrictions are impermissibly overbroad;

h   The Procedures and Restrictions are unconstitutionally vague;

i   The Procedures and Restrictions deprive Plaintiffs of equal protection of the laws;

j   The Procedures and Restrictions deprive Plaintiffs of their right to due process by imposing strict liability for engaging in innocent and First Amendment protected conduct;

k   The Procedures and Restrictions are underinclusive;

l   The Procedures and Restrictions are overinclusive;

m   The Procedures and Restrictions are selectively and discriminatorily applied; and

n   The Procedures and Restrictions operate to chill protected speech.

3.     The "Procedures for Public Use of the Hennepin County Government Center," the Defendants' unwritten restrictions on OccupyMPLS, and the acts by the Defendants as set forth herein, have violated Plaintiffs' rights to freedom of assembly, freedom of association, freedom of speech and expression, freedom of the press, and freedom to petition the government for redress of their grievances, all of which are protected by the First, Fifth and/or Fourteenth Amendments, and made applicable to the state and local governments by 42 U.S.C. § 1983.

4.     Plaintiffs are therefore entitled to a declaration that the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten

restrictions on OccupyMPLS violate their rights secured by the First, Fifth and Fourteenth Amendments to the Constitution, both on their face and as applied.

## COUNT II

5.      Plaintiffs incorporate all previous allegations as if set forth herein.

6.      Defendants' conduct and threatened conduct threatens to deprive Plaintiffs of their rights secured by the First, Fifth and Fourteenth Amendments, and has caused and will cause in the future irreparable harm to Plaintiffs for which there is no adequate remedy of law.

7.      By reason of Defendants' misconduct and threatened misconduct, and the irreparable harm Plaintiffs have suffered and will continue to suffer, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants, their officers, agents, servants, attorneys, and any person acting in concert and participation with them, with actual notice of the injunction by personal service or otherwise, from enforcing the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions on OccupyMPLS.

8.      By reason of Defendants' misconduct and threatened misconduct, and the irreparable harm Plaintiffs have suffered and will continue to suffer, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction requiring Defendants, their officers, agents, servants, attorneys, and any person acting in concert and participation with them, with actual notice of the injunction by personal

service or otherwise, to make electricity available to Plaintiffs on the Plazas through Defendants' existing electrical outlets to convey their message.

## COUNT III

9.     Plaintiffs incorporate all previous allegations as if set forth herein.

10.     In giving Plaintiffs trespass notices, threatening them with arrest, and arresting them for violations of the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions against OccupyMPLS, Defendants acted under color of law.

11.     In giving Plaintiffs trespass notices, threatening them with arrest, and arresting them for violations of the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions against OccupyMPLS, Defendants were acting within the scope of their respective duties.

12.     In giving Plaintiffs trespass notices, threatening them with arrest, and arresting them for violations of the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions against OccupyMPLS, Defendants denied to Plaintiffs the rights to expression, speech, assembly, association, and the press that are secured by the First, Fifth and Fourteenth Amendments to the Constitution and the laws of the United States.

13.     The denial of Plaintiffs' constitutional rights to engage in protected speech, assembly, association and the press is a compensable injury that entitles Plaintiffs to monetary damages.

14.     Furthermore, to the extent that certain trespass notices issued to Plaintiffs are the result of their engagement in First Amendment protected conduct such as chalking, and constructing symbolic temporary shelters, Plaintiffs are entitled to a temporary restraining order, preliminary injunction and permanent injunction enjoining Defendants, their officers, agents, servants, attorneys, and any person acting in concert and participation with them, with actual notice of the injunction by personal service or otherwise, from enforcing any trespass notices issued to Plaintiffs as a result of engaging in those activities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs each demand judgment as follows:

A.     Upon Count One of their Complaint, a declaration that the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions against OccupyMPLS are unconstitutional under the First and Fourteenth Amendments to the United States Constitution, both on their face and as applied; and

B.     Upon Count Two of their Complaint, a temporary restraining order, preliminary injunction and permanent injunction enjoining the Defendants, their officers, agents, servants, employees and those acting in concert and participation with them, who receive actual notice of the injunction by personal service or otherwise, from enforcing the "Procedures for Public Use of the Hennepin County Government Center" and the Defendants' unwritten restrictions against OccupyMPLS; and

C.     Upon Count Two of their Complaint, a temporary restraining order, preliminary injunction and permanent injunction requiring Defendants to make electricity

available to Plaintiffs on the Plazas through Defendants' existing electrical outlets to convey their message.

D.      Upon Count Three of the Complaint, compensatory damages in an amount to be determined at trial; and a preliminary injunction and permanent injunction enjoining the Defendants, their officers, agents, servants, employees and those acting in concert and participation with them, who receive actual notice of the injunction by personal service or otherwise, from enforcing any trespass notices issued to Plaintiffs as a result of their engaging in First Amendment protected conduct such as chalking, and constructing symbolic temporary shelters.

E.      Upon all counts of the Complaint, the costs and expenses in maintaining this action, including Plaintiffs' reasonable attorneys' fees, as well as any other relief, whether legal or equitable, to which Plaintiffs may be entitled.

**A JURY TRIAL IS REQUESTED IN THIS MATTER.**

Dated: November 21, 2011         **MASLON EDELMAN BORMAN & BRAND, LLP**


By:      s/Alain M. Baudry
         Justin H. Perl (#151397)
         Alain M. Baudry (#186685)
         Leora M. Itman (#0390029)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:   612-672-8200
Facsimile:   612-642-8397
E-mail:      justin.perl@maslon.com
             alain.baudry@maslon.com

-and-

**LEONARD STREET AND DEINARD**
Timothy P. Griffin (#0285717)
Brian W. Thomson (#0322416)
150 South Fifth Street
Suite 2300
Minneapolis, MN 55402
Telephone:   612-335-1500
Facsimile:   612-335-1657
E-mail:      timothy.griffin@leonard.com
             brian.thomson@leonard.com

-and-

**ACLU OF MINNESOTA**
Teresa Nelson (#0269736)
Suite 180
2300 Myrtle Avenue
Saint Paul, MN 55114
Telephone:   651-645-4097
Facsimile:   651-647-5948
E-mail:      tnelson@aclu-mn.org

**ATTORNEYS FOR PLAINTIFFS**

849890

## VERIFICATION

I, BENJAMIN EGERMAN, state that I have reviewed the Verified Complaint and specifically Paragraphs 4, 5, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 33, 34, 36, 37, 39, 40, 42, 43, 44, 45, 46, 47, 59, 60, 63, 64, 65, 66, 67, 68 and believe the same to be true and correct based on my knowledge, information, and belief.   To the extent this Verification is based on my information and belief, I believe such information to be true.

s/Benjamin Egerman

Sworn to and subscribed before me
this 21st day of November, 2011

s/Georgia A. Solnitzky
Notary Public

## VERIFICATION

I, BENJAMIN PAINTER, state that I have reviewed the Verified Complaint and specifically Paragraphs 4, 6, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 33, 34, 36, 37, 39, 40, 42, 43, 47, 59, 60, 63, 64, 65, 66, 67, 68 and believe the same to be true and correct based on my knowledge, information, and belief.  To the extent this Verification is based on my information and belief, I believe such information to be true.

_____

Sworn to and subscribed before me
This 21st day of November, 2011

_____
Notary Public

## VERIFICATION

I, SAMUEL RICHARDS, state that I have reviewed the Verified Complaint and specifically Paragraphs 4, 7, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 33, 34, 36, 37, 38, 39, 40, 41, 42, 43, 47, 58, 59, 60, 63, 64, 65, 66, 67, 68 and believe the same to be true and correct based on my knowledge, information, and belief.  To the extent this Verification is based on my information and belief, I believe such information to be true.

_____

Sworn to and subscribed before me
this 21st day of November, 2011

_____

Notary Public

**VERIFICATION**

I, MELISSA ROWAN, state that I have reviewed the Verified Complaint and specifically Paragraphs 4, 8, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 33, 34, 36, 37, 39, 40, 42, 43, 46, 47, 48, 59, 60, 63, 64, 65, 66, 67, 68, and believe the same to be true and correct based on my knowledge, information, and belief.  To the extent this Verification is based on my information and belief, I believe such information to be true.

s/Melissa Rowan_____

Sworn to and subscribed before me
this 21st day of November, 2011


s/Molly Miller Mons_____
Notary Public