## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Occupy Minneapolis, *et al.*,

|  |  |
|---|---|
| Plaintiffs, | Civ. No. 11-3412 (RHK/TNL) |
| v. | **MEMORANDUM OPINION AND ORDER** |

County of Hennepin, *et al.*,

Defendants.

---

Alain M. Baudry, Justin H. Perl, Leora M. Itman, Maslon Edelman Borman & Brand, LLP, Minneapolis, Minnesota, Timothy P. Griffin, Brian W. Thomson, Leonard Street and Deinard, PA, Minneapolis, Minnesota, Teresa J. Nelson, ACLU of Minnesota, St. Paul, Minnesota, for Plaintiffs.

Daniel P. Rogan, Patrick Diamond, Hennepin County Attorney's Office, Minneapolis, Minnesota, for Defendants.

---

The Plaintiffs in this case, Occupy Minneapolis and several of its members, are loosely affiliated with the recent "Occupy Wall Street" movement.[1] They have been "occupying" two plazas immediately adjacent to the Hennepin County Government Center (the "Plazas") continuously since October 7, 2011, to "call[] attention to the economic injustices ravaging the country." (Compl. ¶ 1.) They allege in this action that Defendants Hennepin County, several of its Commissioners, the Hennepin County Sheriff, and certain of his deputies and security officers (collectively, the "County") have violated their rights under the First, Fifth, and Fourteenth Amendments to the United

---

[1] According to its website, Occupy Wall Street is a "leaderless resistance movement" generally protesting Wall-Street and corporate "greed." See http://occupywallst.org (last visited November 23, 2011).

States Constitution by restricting the ways in which they may "occupy" the Plazas and precluding or limiting certain of their activities there. Presently before the Court is Plaintiffs' Motion for a Temporary Restraining Order (Doc. No. 3). For the reasons set forth below, their Motion will be granted in part and denied in part.[2]

## BACKGROUND

Plaintiffs have maintained a continuous "occupation" of the Plazas since October 7, including sleeping overnight in tents and sleeping bags; cooking and sharing meals; displaying signs; assembling for meetings, demonstrations, and "teach-ins;" and other events. They have broadcast their activities over the internet to others who sympathize with their cause. They assert that a "24/7" presence at the Plazas is necessary to effectively communicate their message, such as the fact "that the foreclosure crisis and homelessness are problems affecting millions of Americans." (Compl. ¶ 22.) They plan to maintain an uninterrupted presence at the Plazas "until the change they seek is achieved" (id. ¶ 21), although it is not entirely clear what that "change" is.

Prior to Plaintiffs' "occupation," the County did not have in place written procedures relating to individuals assembling at the Plazas indefinitely. However, it previously had *unwritten* policies precluding persons from sleeping on the Plazas, storing personal items there, and affixing signs to or using chalk on the Plazas' buildings or other structures. On the day Plaintiffs arrived at the Plazas, for example, they were informed that the County precluded the erection of tents or other structures on the property;

---

[2] The following constitute the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 65.

prohibited the use of cooking equipment such as propane or charcoal grills; and did not permit any other conduct that could be hazardous to public safety or could damage County property.  Nevertheless, Plaintiffs violated several of these restrictions, including putting up tents and writing on Plaza property with chalk.  Although the County initially declined to enforce some of its policies in order to avoid a "confrontation" with Plaintiffs, eventually it began to enforce its unwritten rules by, among other things, removing tents and other structures, removing signs affixed to Plaza property, and issuing trespass notices to persons who chalked on Plaza grounds.

On November 8, 2011, the County cut off electricity to the Plazas, which Plaintiffs had been using to continuously stream their activities and "occupation" over the internet. On that same day, the County passed a resolution (the "Resolution") restricting certain activities at the Plazas.  Of pertinence here, the Resolution prohibited any signs or posters "except those placed by county personnel related to county business" from being affixed to Plaza property; precluded the storage of items there or the leaving of items there "unattended"; and prohibited individuals from sleeping at the Plazas.[3]  According to the County, Plaintiffs have refused to abide by these newly enacted restrictions or its other, unwritten ones.

On November 21, 2011, Plaintiffs commenced this action, asserting that the Resolution and the County's unwritten regulations violate, *inter alia*, their rights to

---

[3] Plaintiffs claim that the County enacted the Resolution without providing them sufficient advance notice and in violation of the County's own rules and procedures, in violation of their Fourteenth-Amendment due-process rights.  Suffice it to say, the meager evidentiary record on these issues presently before the Court does not support Plaintiffs' contentions.  (See, e.g., Johnson Decl. ¶ 6; Hough Decl. ¶ 10.)

freedom of speech, assembly, and to petition the government for redress of grievances under the First Amendment to the United States Constitution.  They have now moved for a Temporary Restraining Order with respect to six specific restrictions imposed by the County:  the bans on (1) placing structures of any kind on the Plazas; (2) using existing electrical outlets on the Plazas; (3) using sidewalk chalk on the Plazas; (4) affixing signs or posters to Plaza property; (5) leaving property "unattended" or "stored" on the Plazas; and (6) sleeping on Plaza property.  (Doc. No. 4 at 2.)  They claim that all but one of these restrictions violate their free-speech rights under the First Amendment; as for the last restriction (number (5), above, concerning unattended or stored property), they assert that the Regulation violates due process because it is unconstitutionally vague.  The County timely filed a response to the Motion, and the Court held a hearing on November 23, 2011.  The Motion is now ripe for disposition.

## STANDARD OF DECISION

As the Supreme Court recently emphasized, injunctive relief "is an extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  This Court must consider four factors to determine whether such relief is warranted here:  (1) Plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm to Plaintiffs in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the County; and (4) the public interest.  E.g., Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting

Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*)).[4]

When analyzing these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).

In First Amendment cases such as this one, however, the Court's primary focus is on the first element:  likelihood of success.  This is because the remaining factors necessarily turn on whether there has been a showing that the plaintiff's constitutional rights have been violated:

> It is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Likewise, the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to protect constitutional rights.  The balance of equities, too, generally favors the constitutionally-protected freedom of expression.

Phelps-Roper v. Nixon, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted).

To show a likelihood of success on a particular claim, Plaintiffs need not "prove a greater than fifty percent likelihood that [they] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather must only show that the claim provides a "fair ground for litigation," Watkins, 346 F.3d at 844; accord, e.g.,

---

[4] Although Dataphase was a preliminary-injunction case, the same standards apply to applications for temporary restraining orders.  See, e.g., Bel Canto Design, Ltd. v. MSS HiFi, Inc., Civ. No. 11-2126, 2011 WL 3798586, at *4 (D. Minn. Aug. 25, 2011) (Doty, J.); Nw. Airlines, Inc. v. Filipas, Civ. No. 07-4803, 2008 WL 251872, at *1 n.1 (D. Minn. Jan. 30, 2008) (Ericksen, J.).

Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (*en banc*) (movant must show it has a "fair chance of prevailing").[5]

## ANALYSIS

I.     **Whether the challenged restrictions regulate "speech"**

The First Amendment precludes the enaction of laws "abridging the freedom of speech." U.S. Const. amend. I. The County argues that certain of the items challenged by Plaintiffs do not implicate their First-Amendment rights because they do not involve "speech." (E.g., Def. Mem. at 13-15.) The Court agrees in part.

The word "speech" in the First Amendment "is not construed literally, or even limited to the use of words." Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 158 (3rd Cir. 2002). "In addition to protecting literal speech, the First Amendment protects some expressive conduct," Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of W. Pikeland, 721 F. Supp. 2d 361, 372 (E.D. Pa. 2010), as long as it is "sufficiently imbued with elements of communication," Spence v. Washington, 418 U.S. 405, 409-10 (1974) (*per curiam*). The Court concludes that one of the restrictions about which Plaintiffs complain is not sufficiently imbued with elements of communication to be protected "speech."

---

[5] At oral argument, the County asserted that because Plaintiffs challenge government regulations, the "fair chance of prevailing" standard does not apply, but rather Plaintiffs must make a higher showing of *likely* success on the merits. Planned Parenthood did indeed draw such a distinction when a plaintiff seeks to "enjoin the implementation of a duly enacted state statute" rather than seeking to enjoin "something other than government action." 530 F.3d at 732-33. Here, however, this distinction is immaterial. As set forth below, for all but one of their claims, Plaintiffs have failed to show that they have even a "fair chance of prevailing" on the merits. Accordingly, they cannot satisfy the *higher* stand of *likely* success on the merits for those claims *ipso facto*. As for the remaining claim, which concerns signage (see infra at 10-12), the Court concludes that Plaintiffs have shown they are, in fact, likely to succeed on the merits.

In particular, Plaintiffs assert that the County's decision to cut-off electricity violates their free-speech rights because "the use of equipment to amplify a protester's message is an aspect of free speech." (Pl. Mem. at 12.)  But the key case they cite for that proposition, Saia v. New York, 334 U.S. 558 (1948), is distinguishable.  There, an ordinance required individuals to obtain a permit before using a loudspeaker, which the Court described as an "indispensable instrument[] of effective public speech." Id. at 561. Here, by contrast, Plaintiffs' access to electricity is not "indispensable" to disseminating their message, and nothing in the record indicates that they cannot "effectively" express themselves absent internet access.  In any event, government need not make its utilities available to anyone seeking to advance a message; the First Amendment does not guarantee access to property for speech activities simply because it is government-owned. See, e.g., Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 803 (1985); City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 814 (1984) ("[T]he mere fact that government property *can* be used as a vehicle for communication does not mean that the Constitution *requires* such uses to be permitted.") (emphases added); Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1149 (10th Cir. 2001) ("The First Amendment . . . does not require the government to . . . enhance the strength of the speaker's message in the marketplace of ideas.").  Accordingly, the Court concludes that Plaintiffs may not challenge the County's decision to cut off electricity to the Plazas on free-speech grounds.[6]

---

[6] Plaintiffs assert that the County has made electricity available for public functions in the past (and raises similar arguments with respect to the use of chalk and the hanging of signs, discussed

The Court disagrees with the County, however, that precluding Plaintiffs from sleeping on the Plaza or erecting tents or other structures does not implicate First-Amendment concerns. Plaintiffs correctly note that "tent cities and temporary shanties built on public property can be a form of expressive symbolic communication." (Pl. Mem. at 10.) While some courts have questioned whether sleeping in public is in fact expressive activity, see, e.g., United States v. Gilbert, 920 F.2d 878, 883-84 (11th Cir. 1991), most courts assume that to be the case. And, of particular relevance here, the United States District Court for the Middle District of Florida recently held that "tenting and sleeping" in a public park by another "Occupy" group was protected speech under the First Amendment. Occupy Fort Myers v. City of Fort Myers, No. 2:11-cv-00608, 2011 WL 5554034, at *5 (M.D. Fla. Nov. 15, 2011). The Court agrees with that well-reasoned conclusion and, hence, Plaintiffs may challenge the ban on sleeping and erecting structures under the First Amendment.

## II.   The remaining challenges

There does not appear to be any dispute that the Plazas are "traditional" public fora and, hence, occupy a "special position in terms of First Amendment protection" that leaves the County with a "very limited" ability to restrict expressive activity there. Boos v. Barry, 485 U.S. 312, 318 (1988). Nevertheless, expressive activity may be subject to

---

in more detail below). But "the First Amendment does not mandate perfect consistency" in the application of a regulation. Clear Channel Outdoor, Inc. v. City of N.Y., 608 F. Supp. 2d 477, 499 (S.D.N.Y. 2009) (citations omitted). Regardless, even if Plaintiffs were correct that the County has inconsistently applied certain of its rules, the Court does not believe, on the limited current record, that they have made a significant showing that such inconsistent applications rise to the level of a constitutional violation.

reasonable time, place, and manner restrictions even in a traditional public forum such as a park or sidewalk.  E.g., Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

When assessing whether a restriction on speech is valid, the first question to be answered is whether it is content-based or content-neutral.  E.g., City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 46 (1986).  Content-based regulations "presumptively violate" the First Amendment, id., while content-neutral regulations "that impose an incidental burden on speech" receive "intermediate scrutiny," Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662 (1994); accord City of L.A. v. Alameda Books, Inc., 535 U.S. 425, 443 (2002), meaning they pass muster only if they "serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication," Renton, 475 U.S. at 46.  A regulation is content-based rather than content-neutral when "the message conveyed determines whether the speech is subject to restriction."  Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736 (8th Cir. 2011).

With these precepts in mind, the Court considers each of Plaintiffs' remaining First-Amendment challenges.

## A.    Chalking

The County's unwritten rules prohibit *any* chalking on Plaza property, on any topic, and accordingly this proscription is content-neutral.  See, e.g., Alameda Books, 535 U.S. at 448 (Kennedy, J., concurring) ("[W]hether a statute is content neutral or content based is something that can be determined on the face of it."); Phelps-Roper, 545 F.3d at

691 ("The plain meaning of the text controls.").[7]  The question, then, is whether the prohibition on using chalk to write Plaintiffs' "political messages" serves a substantial government interest and leaves open sufficient alternative means to communicate. Renton, 475 U.S. at 46.  The Court finds that to be the case here.  Notably, the Court agrees with the County that it has a significant interest in "controlling the aesthetic appearance of" the Plazas.  (Def. Mem. at 35.)  See, e.g., Taxpayers for Vincent, 466 U.S. at 810; Mahoney v. Doe, 642 F.3d 1112, 1118 (D.C. Cir. 2011).  And, the Court believes that Plaintiffs have ample alternative methods of communication available to them, including passing out flyers, carrying or wearing signs, and public speaking. Accordingly, the chalking restriction is not unconstitutional.

**B.      Posting or hanging signs**

With respect to the hanging or posting of signs, the Resolution differs significantly from the ban on chalking.  Whereas the latter precludes *all* use of chalk on Plaza property, the former does not ban the hanging of *all* signs there.  Rather, it creates an exception for those signs or posters "placed by county personnel related to county business."  This difference is crucial.

The "plain meaning" of the Resolution's text suggests that content approved by the County is permissible, while content approved by the Plaintiffs (or anyone else) is not.  Plaintiffs therefore raise a colorable argument that the Resolution's sign restriction is content-based.  See, e.g., Neighborhood Enters., 644 F.3d at 736 (regulation content-

---

[7] For this reason, the Court rejects Plaintiffs' argument that the Resolution is content-based because it was passed in response to the Occupy movement.

based when "the message conveyed determines whether the speech is subject to

restriction"); Desert Outdoor Adver., Inc. v. City of Moreno Valley, 103 F.3d 814, 820

(9th Cir.1996) (applying content-based test to exemptions for official notices, directional,

warning, or information structures, public utility signs, and structures erected near a city

or county boundary which contain the name of the city, county, or civic, fraternal, or

religious organizations located therein).

      Of course, it is distinctly possible that the Resolution was intended only to permit

County officials from posting signs containing information about the location of County

buildings or the provision of certain County services, as the City argues. (See Def. Mem.

at 37 (arguing that the signs placed by the County on the Plaza "help perform functions

related to [the] County's buildings, e.g., directing people to entrances, informing

individuals that smoking is not allowed," etc.).) Even if true, this would not insulate the

Resolution from challenge. Indeed, in Desert Outdoor Advertising, the court found a

billboard regulation unlawfully content-based simply for exempting "official notices and

directional or informational signs" from its reach. 103 F.3d at 820. Moreover, the

Resolution's wording sweeps within its ambit far more than such signs; it permits a

county employee to post a sign on any topic "*related to* county business," conceivably

permitting signage regarding any number of matters beyond "functions related to [the]

County's buildings."

      Ultimately, however, the Resolution's neutrality – or lack thereof – must be

determined from its *face*, not from its unstated purpose or intent. Because, on the

Resolution's face, one must "examine the content of . . . signs to determine whether the

[Resolution] applies," <u>id.</u>, its prohibition on affixing signs to Plaza property appears to be content-based. Hence, Plaintiffs have established a likelihood of prevailing on this claim, <u>Planned Parenthood</u>, 530 F.3d at 732, because content-based regulations "presumptively violate" the First Amendment, <u>Renton</u>, 475 U.S. at 46; <u>accord</u> <u>Alameda Books</u>, 535 U.S. at 455 (Souter, J., dissenting) (noting that content-based restrictions receive "strict scrutiny," which "leaves few survivors").

### C.  Erecting tents/sleeping

As noted above, courts have recognized that erecting tents and sleeping on public property constitute protected expression. Nevertheless, the Court concludes that the Resolution's ban on sleeping on Plaza property, and its concomitant prohibition on erecting tents and similar structures, is a valid time, place, and manner restriction. Indeed, that conclusion is dictated by <u>Clark</u>.

This Court need not recite all of <u>Clark</u>'s pertinent facts. Suffice it to say, there the Supreme Court upheld as a reasonable time, place, and manner restriction a National Park Service regulation prohibiting camping in Lafayette Park in Washington, D.C., where "camping" was defined, *inter alia*, as "the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), . . . or using any tents or . . . other structure . . . for sleeping." 468 U.S. at 290-91. The Court cannot perceive a reason not to apply <u>Clark</u> here, and Plaintiffs' attempts to distinguish it are simply unavailing. They argue, for example, that they have no alternative means of expressing themselves through sleeping because the Resolution completely bars them from doing so on Plaza grounds

(Pl. Mem. at 29), but that was just as true in <u>Clark</u>, which banned all sleeping in Lafayette Park.  The Court finds Plaintiffs' other arguments to be equally unavailing and, accordingly, it concludes that this portion of the Resolution passes constitutional muster.

At oral argument, Plaintiffs asserted that the Court should distinguish between *sleeping* at the Plazas and *erecting tents* there, the latter of which (according to Plaintiffs) falls outside <u>Clark</u>'s reach.  The Court believes this is a distinction without a difference, as other courts have recognized that there is no "private constitutional right to erect a structure on public property.  If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures.  Public parks are certainly quintessential public forums where free speech is protected, but *the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will.*"  <u>Lubavitch Chabad House, Inc. v. City of Chicago</u>, 917 F.2d 341, 347 (7th Cir. 1990) (emphasis added).

## III.    The due-process challenge

The remaining claim asserted in the instant Motion concerns the Resolution's prohibition on storing items on Plaza property and leaving items "unattended" there. Plaintiffs do not appear to challenge that restriction on free-speech grounds, but rather assert that it is "impermissibly vague" and, hence, violates due process.  (Pl. Mem. at 23-24.)  The Court does not agree.

The crux of Plaintiffs' argument is that the Resolution fails to define the terms "unattended" and "stored," thus leaving Plaintiffs with "no way of knowing whe[n] their property will be . . . subject to seizure and destruction."  (<u>Id.</u> at 24-25.)  They point out

- 13 -

that Minnesota statutes and certain cases have used varying definitions for the word "unattended," leaving them unsure what conduct falls within its ambit.  (Id. at 24 ("Is an item that is out of the immediate physical possession of a protestor 'unattended'?  How far away must a protestor be from her personal possessions, and for how long, before the item is deemed 'unattended'?").)

Yet, as the County correctly notes, "language is unavoidably inexact and . . . statutes cannot, in reason, define proscribed behavior exhaustively or with consummate precision."  (Def. Mem. at 21 (quoting United States v. Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988)).)  While "[t]here might be quibbles" about the meaning of the words "unattended" and "stored," these terms are neither legalistic nor out of the typical person's vernacular; rather, they are familiar, everyday words capable of being easily understood.  U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 578-79 (1973).  Accordingly, they are not impermissibly vague in violation of due process.  Id.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 3) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** to the extent it seeks to enjoin the County from enforcing that portion of the Resolution prohibiting signs or posters from being taped or otherwise affixed to Plaza property, and it is **ORDERED** that the County and all those acting in concert with it or at its direction

- 14 -

are **TEMPORARILY ENJOINED**, pending further Order of the Court, from enforcing this portion of the Resolution.  In all other respects, Plaintiffs' Motion is **DENIED**.[8]

The Court notes, regardless of this Order, that Plaintiffs are unlikely to leave the Plazas anytime soon.  The County has recognized that Plaintiffs may assemble there during any hour of the day, and Plaintiffs have indicated their willingness to do so for the foreseeable future.  Hence, the parties are going to have to "learn to live" with one another.  To that end, before they undertake expensive (and likely acrimonious) discovery, it is **ORDERED** that they participate in an expedited settlement conference before Magistrate Judge Leung.  The parties should contact Judge Leung's chambers to schedule that conference.[9]  The Court strongly encourages the parties to consider resolving this matter via Stipulation regarding their conduct and obligations to one another, as in the case of the "Occupy" movement in Dallas, Texas.  See Dawson v. City

---

[8] The Federal Rules of Civil Procedure require a plaintiff to post bond before a temporary restraining order becomes effective.  Fed. R. Civ. P. 65(c).  "The amount of the bond is entrusted to the Court's sound discretion; it should be set in an amount that will insure the non-movant against any financial loss it might sustain as a result of the injunction, in the event the non-movant ultimately prevails in the litigation." Paul's Industrial Garage, LLC v. City of Red Wing, Civ. No. 06-4770, 2006 WL 3804243, at *8 (D. Minn. Dec. 22, 2006) (Kyle, J.) (citing N. States Power Corp. v. Fed. Transit Admin., 270 F.3d 586, 588 (8th Cir. 2001)).  In light of the public interests at issue in this case and the little harm (if any) the Court perceives the County will suffer as a result of this Order, the Court determines that an appropriate bond is $100.  The temporary restraining order described above will become effective upon Plaintiffs posting bond in this amount.

[9] Plaintiffs' counsel have indicated they intend to conduct discovery for approximately six weeks before moving the Court for a preliminary injunction.  The Court leaves it to the Magistrate Judge to determine the appropriate limits on discovery.  The Court notes, however, that based on its evaluation of Plaintiffs' claims above, discovery is unlikely to alter the Court's analysis or render Plaintiffs substantially more likely to prevail on most of their claims.

of Dallas, No. 3:11-CV-2698 (N.D. Tex. Oct. 14, 2011) (stipulations regarding enforcement of various provisions of Dallas City Code).

Dated: November 23, 2011          s/Richard H. Kyle
                                              RICHARD H. KYLE
                                              United States District Judge